UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 17-CR-178

HARSHINDER P. BHATIA,
a/k/a "SHINDA BHATIA,"

Defendant.

---

**UNITED STATES' SENTENCING MEMORANDUM**

---

The United States, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and Erica J. Lounsberry, Assistant United States Attorney, hereby submits the following memorandum in advance of sentencing. The purpose of this memorandum is to highlight aspects of Bhatia's conduct and history beyond what is included in the presentence investigation report (PSR) that support the United States' sentencing recommendation. The government also takes this opportunity to respond to some of the materials submitted by the defense for inclusion in the PSR and in his Sentencing Memorandum.

## I. OVERVIEW

Harshinder P. Bhatia has lived the American Dream. He moved to the United States from India at age 17 and later became a naturalized American citizen. Together with his older brother, Rashinder Lal, he bought and managed a series of gas stations and convenience stores all around the Milwaukee area. He bought a comfortable home in the suburbs and raised two children who grew up to be respected and successful. He accomplished all of this, however, at the expense of the dreams of others.

Bhatia began hiring undocumented workers for his gas stations, largely adult men from India who had come to the United States in search of economic opportunity. While seemingly offering them that opportunity, Bhatia took advantage of their powerless situations to advance his own. He required his employees to work long overtime hours but did not compensate them for the extra work. He did not provide benefits or remuneration for employees injured on the job. He frequently paid late, sometimes even weeks or months late. Employees would have to beg Bhatia repeatedly to get just enough of their wages to pay overdue bills. Unsurprisingly, these practices led many employees to quit, sometimes with a bit of self-help on their way out the door.

The victim in this case, L.K., found herself in an even worse predicament. Like Bhatia, L.K. came to the United States at age 17. While Bhatia followed his brother, L.K. was brought by her father, who was pursuing his own American Dream. Bhatia promised L.K.'s father not only an opportunity to work, but also green cards and an American education for his two children.

L.K. was excited. For her part, she dreamed of attending medical school in the United States and becoming a doctor. Instead, L.K. worked twelve-hour unpaid days behind the register of the King's Green Tree gas station. After months, sensing that no green cards were forthcoming, L.K. began demanding the return of her passport and fair compensation for her work. Bhatia's refusals came coupled with threats, violence, and deprivation.

Though Bhatia protests that a Guidelines sentence in this case would destroy all that he has worked hard for, his businesses were built on the backs of fellow immigrants whom he treated unfairly. He violated not only the law in the way he employed them, but also their rights. The government will therefore ask that this Court sentence Bhatia to 30 months in federal prison, the upper end of his U.S. Sentencing Guidelines range as calculated within the PSR.

## II. PROCEDURAL HISTORY

On October 19, 2017, the grand jury returned an indictment charging Bhatia with one count of harboring an alien for commercial advantage or private financial gain, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iii) and (B)(1); one count of forced labor involving aggravated sexual abuse, in violation of Title 18, United States Code, Sections 1589(a) and (d); and one count of unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor, in violation of Title 18, United States Code, Section 1592(a). (ECF No. 1.) On July 18, 2018, a signed plea agreement was filed in which Bhatia pled guilty to the alien harboring charge. (ECF No. 17.) Bhatia appeared before Magistrate Judge Joseph on July 31, 2018 and entered his guilty plea pursuant to the plea agreement. (ECF No. 19.) On August 21, 2018, this Court adopted Magistrate Judge Joseph's recommendation to accept Bhatia's guilty plea (ECF No. 20), and the matter was set for sentencing. (ECF No. 21.)

## III. APPLICABLE LAW

The sentence the Court imposes should be sufficient, though not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, adequately punish the crimes committed, deter other criminal conduct, protect the public from the defendant, and provide for any particularized needs of the defendant. 18 U.S.C. § 3553(a)(2). In determining the appropriate sentence, the Court must consider the factors set forth in 18 U.S.C. § 3553(a). *United States v. Harris*, 490 F.3d 589, 593 (7th Cir. 2007). In addition to the goals outlined above, these factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the Sentencing Guidelines range; and the need to avoid unwarranted disparities among similarly situated defendants.

Courts should impose sentences that take a holistic view of a defendant's characteristics and conduct, as well as the impact of that conduct on the community. In doing so, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited as to the kind of information he may consider, or the source from which it may come." *United States v. Jones*, 635 F.3d 909, 917 (7th Cir. 2011) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)). This principle is echoed in 18 U.S.C. § 3661, which states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also* 18 U.S.C. § 3553(a)(1) (directing consideration of the "history and characteristics of the defendant"). "The facts that a sentencing judge finds in determining what sentence to impose—such facts as the defendant's criminal history, his cooperation or lack thereof in the government's investigation, and his remorse or lack thereof—need be found only by a preponderance of the evidence." *United States v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007).

## IV. NATURE AND CIRCUMSTANCES OF THE OFFENSE

The nature of the offense of conviction here is, to a large degree, self-evident from the elements of the charge. Bhatia harbored L.K. and shielded her from government detection by housing her in a duplex he owned, employing her off the books, and attempting to limit her contact with Americans to only that necessary to carry out her job as a gas station cashier. Bhatia and his brother, Rashinder Lal, owned the gas station where L.K. worked, so harboring L.K. benefitted both Bhatia's personal and corporate financial situations.

The surrounding circumstances, however, are more egregious than the charge itself reveals. Bhatia capitalized on L.K.'s vulnerabilities for monetary gain. L.K.'s efforts at resistance were met variously with threats of deportation, slaps to the face, hair pulling, kicking, and sexual

assaults. Though some of Bhatia's relatives, friends, and neighbors have offered letters of support professing their shock at these allegations, Bhatia's exploitation of L.K. actually stands out as one of the more dramatic examples in a larger pattern of what could generously be termed irresponsible business practices and would more frankly be called greed. Below, some notable attributes and instances of his conduct are examined.

**A. Prolonged Nature of the Criminal Conduct**

L.K. was forced to work for Bhatia at his gas stations for two years, from March 2009 until early April 2011. Though Bhatia had never paid her, he compounded L.K.'s hardships after her father's return to India in August 2009 by becoming threatening and violent toward her. For more than a year and a half, L.K. had to juggle working twelve-hour shifts every day of the week with playing sole guardian to her fifteen-year-old brother, shielding him as best she could from their struggles.

**B. Special Vulnerabilities of the Victim**

L.K.'s characteristics and circumstances made her especially easy to take advantage of. Once her father left, she was an eighteen-year-old illegally living and working in a foreign country while caring for her younger brother without adequate resources. Her English at the time of her arrival was limited to basic conversational skills. She lacked knowledge of the American legal system and the services available to someone in her position.

L.K. also found herself in the difficult position of trying to trust and respect her family while struggling with the real adversities of her situation. When L.K. told her father during their phone calls that Bhatia was not paying her, he tried to reassure her that Bhatia was probably applying her wages toward expenses associated with getting green cards for her and her brother. Later, when L.K. tried to tell her mother about the sexual abuse, her mother was so wholly unable

to cope with that revelation that L.K. had to backtrack and tell her mother that Bhatia had only attempted to rape her. L.K. also felt responsible for her brother, H.S., having *his* chance at the American Dream. She feared taking any action that would jeopardize his education or their long-term ability to stay in the United States. In these ways, L.K. felt responsible at her young age for shouldering the expectations of her whole family. These vulnerabilities gave Bhatia a foothold for manipulation and control.

**C. Threats and Violence**

One of the most serious aspects of Bhatia's conduct is the way her threatened and physically abused L.K. His attacks came in response to L.K.'s refusals to quietly accept Bhatia's treatment of her. Whenever she asked to be paid, asked for more food, or asked for her passport—all basic entitlements— or when she failed to come to work in protest of these denials, she risked that Bhatia would strike her, threaten to call the immigration authorities on her, or drag her out of the house to force her to comply. In the end, this escalated to multiple sexual assaults that Bhatia said were to punish her for her disobedience.

**D. Pattern of Exploiting Employees**

Although Bhatia's mistreatment of L.K. rose to an exceptional level, Bhatia was known for generally overworking and underpaying his undocumented employees. One example is Kuljit Singh Walia, who left in 2009 because Bhatia regularly failed to pay him his full wages. Santokh Singh also quit because Bhatia owed him months of back wages. In December 2010, Santokh filed a complaint with the Wisconsin Department of Workforce Development in an effort to recover this money. The complaint explained that he had not been fully paid for his work since November 2009, and that when Santokh asked for payment, Bhatia told Santokh he had no money. Santokh ended up relinquishing his claim in January 2011 after Bhatia begged him that he would be

financially ruined if Santokh insisted on payment. Bhatia appealed to him as a countryman and a brother, and Santokh felt culturally that he could not refuse.[1]

Other employees, like Kanti Patel and Ricky Singh, were injured while working for Bhatia and never received medical treatment. Ricky left. Kanti worked for Bhatia for nearly a decade, overlooking the poor working conditions, pay schedule, wages, and hours, and even coming in early to mow the grass (unpaid), all in the hopes of keeping a secure employment. Instead, he ended up being unceremoniously let go by Bhatia, seemingly in order to create a job opening for one of Bhatia's relatives.

Each of these witnesses, and others like Jaswinder Kaur and Terrell Bell, have related stories of others whom Bhatia had treated similarly. Some even recalled that Bhatia would not pay vendors for deliveries until he absolutely had to. This is consistent with the manner in which Bhatia has handled his financial obligations to his creditors and the IRS, which is explored in greater detail below. Based upon this anecdotal evidence, it appears Bhatia would often test the patience of those to whom he owed money. The most longsuffering, inevitably, suffered most.

## V. HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Bhatia has portrayed himself in his sentencing memorandum as "a good neighbor, good business citizen, and father." (ECF No. 24.) He claims that other than "intermittent" employment of undocumented workers, he has always followed the law and "contributed substantially to the economy and employment environment in Milwaukee." (ECF No. 24.) Some key aspects of Bhatia's history and conduct beyond his treatment of his employees, however, challenge his claims of a blemish-free reputation.

---

[1] These appeals mirror the one that Bhatia now makes to this Court to be spared a prison sentence that he says would ruin him and his remaining businesses.

As detailed in the government's response to Bhatia's PSR objections, a judgment of over one million dollars was recently entered against Bhatia in an action brought by the State Bank of Texas. In January 2016, the Bank sought judgment against Bhatia, Rashinder Lal (his brother), and RH Companies on unpaid notes. Bhatia had guaranteed a $1.2 million loan to RH Companies in 2008. In 2016, RH Companies still owed over a million dollars on that note, $992,000 of which was principal. Bhatia and Lal had also borrowed $47,704 in 2010 in their personal capacities. When the civil action was filed, Bhatia and Lal still owed the bank more than $32,000, nearly all of which was principal. The Bank also involved the government in the case because of IRS liens on nearly all of their properties resulting from years of unpaid taxes. Bhatia personally owed the IRS over $200,000, and RH Companies owed the IRS approximately $147,000.

Bhatia fought the suit for more than a year and a half, however the court entered a money judgment against him for $1,188,266.744 on the loan defaults alone. Bhatia, Lal, and RH Companies subsequently negotiated a stipulation with the Bank that included Bhatia paying $150,000 by Bhatia to the IRS to satisfy part of his debts owed to the United States.

Bhatia explains all of this by saying he got bad advice from an accountant from 2004 through 2006. Even assuming this is true, he does not offer an explanation for why he did not pay his large and ever-growing tax debt in the decade before the lawsuit was brought that led to the negotiated payments. He also does not explain why he belatedly filed his 2016 and 2017 taxes in 2018, despite then being (if he was not before) keenly aware of his tax obligations, and supported by a reputable accountant and tax attorney. Therefore, when Bhatia alleges that he has been a law-abiding citizen who contributes positively to the economy, he is omitting important details that demonstrate otherwise.

## VI. APPLICABLE SENTENCING GUIDELINES

The maximum penalties for the offense of conviction in this case include ten years in prison, a $250,000 fine, a mandatory special assessment of $100, and 3 years of supervised release. 8 U.S.C. § 1324(B)(i); 18 U.S.C. §§ 3571(b)(3), 3583(b)(2). The base level under the United States Sentencing Guidelines for a conviction on a charge of 8 U.S.C. § 1324(a)(1)(A)(iii) and (B)(i) is 12. U.S. Sentencing Guidelines Manual § 2L1.1(a)(3). Additionally, the following enhancements under the United States Sentencing Guidelines apply:

### A. Serious Bodily Injury

A 4-level increase for serious bodily injury applies pursuant to Sentencing Guidelines Manual § 2L1.1(b)(7)(B) because the offense involved sexual assaults against the victim. As noted in application note 4 of § 2L1.1, "Consistent with Application Note 1(L) of § 1B1.1 (Application Instructions) 'serious bodily injury' is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law." Section 2241 criminalizes aggravated sexual abuse, which it defines as knowingly causing another to engage in a sexual act by a number of prohibited means, including, among others, using force against the victim, or threatening or placing the victim in fear that she or someone else will be subjected to death, serious bodily injury, or kidnapping. Title 18, United States Code, Section 2241(a). The force contemplated by this statute is physical force. *Cates v. United States*, 882 F.3d 731, 737 (7th Cir. 2018) (citing *United States v. Boyles*, 57 F.3d 535, 544 (7th Cir. 1995)). Section 2242 criminalizes causing another to engage in a sexual act using lesser means than § 2241, including by placing the victim in fear other than of death, serious bodily injury or kidnapping. The definition of sexual act for purposes of both sections includes penile-vaginal penetration. 18 U.S.C. § 2246(2)(A).

Here, Bhatia used physical force against L.K., including slapping, punching, kicking, hair-pulling, and pushing, to carry out his sexual assaults. Moreover, the sexual assaults themselves caused serious physical pain to L.K. Bhatia told L.K. during the first assault that he did not care if he hurt her because his goal was to punish her. Bhatia also threatened L.K. with deportation immediately prior to a subsequent sexual assault because L.K. said she would disclose the prior assault to Bhatia's wife.

**B. Involuntary Detention**

A 2-level increase applies under § 2L1.1(8)(A) because Bhatia involuntarily detained L.K. through coercion and threats. As the plain language suggests, this enhancement was intended to account for "involuntary detainment… [that] may not involve physical restraint." U.S. Sentencing Guidelines Manual app. C., vol. III at 180 (Amendment 692).

Bhatia used a variety of coercive conditions in order to cause L.K. to remain living in his duplex and working at his gas station. He physically and sexually assaulted L.K. when she failed to appear for work or demanded to be paid. He held L.K. and her brother's passports so that they could not leave. He also threatened to have L.K. and her brother deported if they continued to argue with him about their living and working conditions or tried to report him. Finally, because Bhatia failed to pay L.K., she and her brother did not have the resources to go elsewhere. As long as L.K. continued to work for Bhatia, she was not free to leave, and as long as she remained in the duplex, she had to keep working for Bhatia. In this way, even though L.K. wanted to leave, she found herself unable due to Bhatia's threats and coercive control.

**C. Vulnerable Victim**

A 2-level increase applies under Sentencing Guidelines Manual § 3A1.1(b)(1)) because L.K. is a vulnerable victim. The vulnerability contemplated in this section may be based on age,

physical or mental condition, or any other condition that makes the victim particularly susceptible to the criminal conduct. U.S. Sentencing Guidelines Manual § 3A1.1 cmt. n.2 (2016). A victim's vulnerability is measured against the general population and not against those groups who are likely to be victims of a particular crime. *United States v. Calimlim*, 538 F.3d 706, 716 (7th Cir. 2008). A victim's membership in a group that is typically vulnerable to a particular manifestation of an offense triggers the applicability of the enhancement regardless of whether the victim is otherwise unusually vulnerable. *Id*. at 717.

L.K. was just 17 years old when Bhatia first brought her and her family to the United States, and she had just turned 20 when she ultimately left his employment and housing. After her father's departure, she was left alone and without a support system in Milwaukee, a city in a foreign country where she had lived for only a few months, to care for her younger brother. She did not have any money and spoke limited English. Bhatia knew about all of these vulnerabilities. Moreover, these characteristics and circumstances go beyond those inherent to the offense of conviction or covered elsewhere in the Sentencing Guidelines, and they made L.K. particularly susceptible to being taken advantage of by Bhatia.

## VII. CRIMINAL JUSTICE OBJECTIVES

A number of the factors for consideration under § 3553(a) speak to the most universal objectives of the criminal justice system. Some of the factors most pertinent to this case include reflecting the seriousness of the offense, serving just punishment, and providing adequate deterrence. Crimes that are the most lucrative compared to their relative risk of detection are some of the most attractive to would-be criminals. To counteract the incentive to commit this type of crime—or return to committing this type of crime—a strong sentence is warranted. *See United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997).

Here, Bhatia spent years, if not decades, exploiting immigrant labor to varying degrees. Because of his employees' fears of deportation and losing what little livelihood they did have, this pattern was not exposed until its dramatic escalation with L.K. Even then, L.K. did not come forward for nearly two years. It took a green card holder and a U.S. citizen (Jaswinder Kaur and Terrell Bell) making a report on L.K.'s behalf before she dared to disclose what she was enduring to the authorities. Until that day, Bhatia had correctly calculated that the benefits of running his business in this way outweighed the low risk that an undocumented person would go to the police and be taken seriously. In order to appropriately punish that kind of conduct, and to stop it from proliferating, a prison sentence at the top of the (relatively low) guidelines range is in order.

Moreover, Bhatia's conduct here went beyond economic exploitation. It involved physical and sexual violence that have permanently affected L.K. In her impact statement, she writes of invasive thoughts and memories of the abuse so overwhelming that they cause her to have migraine headaches. She recounts with sadness and shame how Bhatia took her virginity from her, which she called "the pride of me." She recalls the deep feelings of fear and stress that she lived with, contemplating suicide but for the responsibility and protectiveness she felt toward her brother. This kind of conduct is reflected in the recommended Guidelines increases, and a just sentence in this case should include the additional prison time that corresponds to those increases.

## VIII. RESPONSE TO THE DEFENDANT'S SUBMISSIONS

On October 11, 2018, Bhatia filed extensive objections to the presentence report reflecting his near-total disagreement with the facts of this case. The government has carefully addressed each argument and assertion in a response filed October 17, 2018, which is hereby incorporated, and is included at the end of the addendum to the PSR filed October 19, 2018 (ECF No. 27). This section briefly summarizes some of the government's responses to Bhatia's chief arguments.

**A. L.K.'s Living Conditions**

Bhatia disagrees with L.K.'s description of her living conditions in his duplex. He has offered several photographs of the duplex's interior, and his wife, Annette Bhatia, has warranted in her sworn statement that they accurately reflect the condition and appearance of the duplex at the time L.K. lived there. L.K. and her brother, H.S., have looked all of these photographs and noted many changes from how they remembered the duplex. These include the swapping of worn carpet for hardwood floors, fresh paint, a new kitchen countertop, new bathroom fixtures, new common area furniture, repairs to a broken window, and the installation of a window air conditioning unit. Their account is supported by Ricky Singh and by L.K.'s father, who sent a few photographs from his time in Milwaukee that show, in the background, the appearance of the duplex as it used to look in 2009. Additionally, L.K.'s memories of having the power go out due to nonpayment of the bills are also supported by records from WE Energies.

**B. L.K.'s Employment Conditions**

Bhatia insists that he paid L.K. He has submitted "receipts" and writings in the margins of a calendar that purport to track his payments to her, including one that allegedly shows an advance of more than $24,000. In light of Bhatia's well-known payment practices with other employees, the alleged advances seem particularly unlikely. Bhatia also gives no explanation for why he would need to provide L.K. with large advances.

Furthermore, the "calendar margins" document does not bear any resemblance to a payroll. Even assuming Bhatia kept his payroll records in this haphazard fashion, there are blatant inconsistencies with the claim that these notes reflect payments made. For example, H.S.'s name, with numbers next to it, appears almost as frequently as L.K.'s. H.S., however, did not work for Bhatia, and Bhatia has not claimed that he employed or paid H.S. The few notes written on the

list include phrases like "doctor," "electric bill," and "[H.S.] fee." The amounts are often $200 or $500, but many others are quite small, like $50 or even $10. The dates listed next to the names and amounts are often consecutive or within a few days of one another. Rather than a makeshift payroll, this document appears more likely to be a list of alleged debts representing expenses incurred on L.K. and H.S.'s behalf that Bhatia used to justify nonpayment of L.K.'s work

Bhatia also asserts that he had L.K. work a reasonable schedule with days off and points to Ronika Perkins' statement that she would sometimes take L.K. and H.S. to the mall as proof. L.K. explains that although she worked 12 hours each day, she sometimes coordinated shifts with other employees so that she would start later or, more often, get out of work earlier. This sometimes freed her up to go to a mall or be treated to a meal by Ronika or Jaswinder Kaur.

**C. Threats and Violence**

Bhatia denies that he has ever been physically violent, sexually violent, or threatening in any manner with L.K. Bhatia denies that he ever sexually assaulted L.K. He argues that L.K. has changed the number of sexual assaults in her accounts over the years. L.K. has been forthright that she no longer recalls with certainty how many times Bhatia raped her. She knows that it was more than once, and she believes that it was not more than four times. Though the first time was a shock, and the details stayed clearer, subsequent abuse deadened her senses and remained in her memory simply as a multiplication of her pain. The final assault stands out because it occurred the day after L.K.'s birthday and only a few weeks before she disclosed to law enforcement.

Bhatia claims that he has "passed" a polygraph on the subject of the sexual assaults, thereby proving that the assaults never occurred. Though he does not address it, Bhatia actually underwent two polygraph examinations, the first of which was deemed "inconclusive." In his report of that examination, the examiner noted that while Bhatia denied "all the allegations" regarding L.K., he

admitted to "physical sexual contact with another female employee" that occurred "about 20 years ago." If Bhatia elaborated on the nature of that contact, it was not included in the report. Also missing from the report are the irrelevant, sympathetic, and comparison questions asked.

The only questions actually revealed are two "relevant questions" upon which Bhatia was scored. Interestingly, these two questions are merely the same question repeated twice. Given that "passing" the style of polygraph used here is based on adding the points scored on the two "relevant questions," the repetition of that question appears to give rise to double-scoring. In any event, Bhatia's score on the first exam is not revealed, only the result of "inconclusive."

A little more than a month later, the polygrapher agreed to give Bhatia another exam on exactly the same topic. This time, with the benefit of habituation to the topic and the exam's format, Bhatia scored 4 points on each of the two relevant questions (which were again one and the same). The government submits that the results of this second exam are unreliable and should not be considered given the prior "inconclusive" exam, the fact that only a fraction of the examiner's questions and Bhatia's statements are given, the use of just two relevant questions, and the repetition of those questions.

**D. Witnesses' Credibility**

Bhatia's blanket denials beg the question of why these allegedly fictitious crimes were reported if Bhatia was never violent with L.K., always paid L.K., never kept L.K.'s passport, never threatened L.K., and never mistreated his undocumented employees. Bhatia offers many remarks on the credibility of the witnesses against him, but relatively few explanations of why they would make these statements about him. Below are responses to some of the Bhatia's specific accusations about particular witnesses' truthfulness and motives to lie.

**1. Jaswinder Kaur and Terrell Bell**

Bhatia objects to consideration of any of Jaswinder Kaur and Terrell Bell's statements supporting L.K.'s account on the basis that they are unreliable. In support of this contention, he states that he and his sister, Tej Kaur, accused Jaswinder and Terrell of stealing Tej's car while she was in India for several years. Bhatia suggests that this incident fostered animosity between them, causing Jaswinder and Terrell to lie about him. As evidenced by the reports Bhatia attached to his Objections as Exhibit O, however, Bhatia did not report the theft until June 2013. Thus, the motive to fabricate that Bhatia suggests actually arose more than two years after Jaswinder and Terrell first reported Bhatia's abuse of L.K. to the police.

**2. L.K.**

**a. L.K. and H.S.'s cell phones**

L.K. has admitted that she was not truthful in her reports to law enforcement about her access to a cell phone. Bhatia claims that this alone is reason enough to reject L.K.'s entire testimony. L.K. was tearful and remorseful as she explained how she feared rejection of her claims, or even prosecution, if she revealed that she had encouraged H.S. to work in order to buy phones and reimburse Ronika Perkins for the bill. In many ways, however, L.K.'s revelation lends credibility to some of the more important aspects of her testimony. It demonstrates that L.K. was not being paid, because they were unable to get phones until June 2010, after H.S. had begun working odd hours to save up money. It explains how L.K. and H.S. got some necessities that Bhatia did not supply, beyond relying on people like Jaswinder Kaur and Ronika Perkins for help. It underscores why L.K. felt it was useless to tell her parents what was going on, because she had actually tried but not gotten a helpful response. While the government does not endorse or support

L.K. being untruthful about any aspect of the case, this newly-discovered truth does not destroy rest of L.K.'s account.

**b. T-Visas**

Bhatia has suggested that L.K. and H.S. fabricated their allegations against Bhatia in order to obtain T-visas as victims of human trafficking. They were not, however, aware of the existence of the T-Visa until they had already been interviewed by law enforcement on multiple occasions. Case agents decided that in order to continue with this investigation, they would need to secure continued presence in the United States for L.K. and H.S. To that end, and to assist L.K. and H.S. with their many service needs, case agents made appointments for them with Sojourner Truth House and Heartland Alliance, non-profit organizations that assist victims of labor trafficking, among others. L.K. recalls that it was Angela Hernandez, her Heartland Alliance attorney, who first introduced her to the availability of the T-visa. Therefore, this alleged motive for falsehood also arose after the disclosure.

## IX. CONCLUSION

For the reasons set forth above, the United States believes that a sentence of 30 months, which is within the Guidelines range, is sufficient but not greater than necessary to promote respect for the law, provide just punishment, provide a measure of deterrence, and protect the public. Counsel for the government will make additional remarks at the sentencing hearing.

Dated at Milwaukee, Wisconsin, this 23rd day of October, 2018.

Respectfully submitted,

MATTHEW D. KRUEGER
United States Attorney

By: s/ *Erica J. Lounsberry*
Erica J. Lounsberry
Assistant United States Attorney

Florida Bar No.: 86095
Office of the United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Ave., Room 530
Milwaukee, WI 53202
Tel: (414) 297-1700
Fax: (414) 297-1738
Email: erica.lounsberry@usdoj.gov

18

Case 2:17-cr-00178-JPS Filed 10/23/18 Page 18 of 18 Document 30